# G. T. Wofford Oil Co. *v.* Burgin.

## *Assumpsit.*

(Decided November 10, 1914. Rehearing denied December 15, 1914. 66 South. 931.)

1. *Inspection; Statutes; Repeal.*—Acts 1911, p. 568, had the effect of repealing a local law governing the inspection of mining oils, since the act is general and prescribes a complete system of inspec- tion.

2. *Same; Validity.*—Acts 1911, p. 568, is not violative of section 77, Constitution 1901, as the purpose of the Constitutional provision

[G. T. Wofford Oil Co. v. Burgin.]

was not to prevent the inspection of commodities, but to prevent the creation of offices for that purpose.

3. *Courts; Precedent; Dicta.*—While the appellate court is bound to follow the decisions of the Supreme Court, it is not bound to follow the dicta therein.

4. *Same; Constitutional Question; Certification.*—If the Court of Appeals should conclude that the statute was unconstitutional, it would become the duty of the court to certify the question to the Supreme Court for determination, as in case of disagreement between the judges thereof.

APPEAL from Birmingham City Court.

Heard before Hon. H. A. SHARPE.

Action by Wilson I. Burgin against the G. T. Wofford Oil Company to recover fees for inspecting oils. Judgment for plaintiff and defendant appeals. Reversed and rendered.

TILLMAN, BRADLEY & MORROW, and L. C. LEADBEATER, for appellant. The act of 1911, does not offend section 77 of the Constitution.—*State v. McGough,* 118 Ala. 159; *State v. Carter,* 174 Ala. 266. If a part can be stricken and the rest survive, and remain a complete enactment, capable of being upheld, such will be the order. —*Ham v. The State,* 156 Ala. 645; *Untreinor v. State,* 146 Ala. 133; *Kentz v. City of Mobile,* 120 Ala. 623. The burden is on him who attacks the constitutionality of an act.—*Noble v. Mitchell,* 100 Ala. 519. Where a second act revises the whole subject-matter of the former or is intended to set up a new system, the first act is repealed.—*Gibson v. Mabry,* 145 Ala. 112; *Lehman v. Robinson,* 59 Ala. 219; 36 Cyc. 1090. The law relating to fees is highly penal, and a person who claims them must point to a definite provision of law.—Sec. 3693, Code 1907; *Torbert v. Hale County,* 131 Ala. 144.

J. T. LOWREY, and Allen & BELL, for appellee. There was no need for any other count than the common count.

—*Baldwin v. Kouns*, 81 Ala. 237.   The local act was not repealed by the general acts of 1911; *Jefferson County v. Abernathy*, 139 Ala. 264.   The acts are not at all similar, and are not in conflict with each other.   If the result is that the local act is repealed, then the state office of inspector is created, and the repealing act is void.—*State v. McGough*, 118 Ala. 159; sec. 77, Constitution 1901.   The act is so framed that it cannot be separated into different parts consistent with the legislative intent in its adoption.—*Randolph v. Builders & Painters Sup. Co.*, 106 Ala. 501; Sutherlin Stat. Const. 175.

THOMAS, J.—The appellee, Burgin, as oil inspector of Jefferson county, who was appointed such by the board of revenue of said county under the authority of the provisions of the local act approved February 27, 1901, entitled an act "To prevent the sale or use in the county of Jefferson of impure miners' oil," etc.   (Local Acts 1901, p. 1249), brought this action to recover of the appellant oil company, who dealt in such oils in said county, the compensation allowed under section 12 of the act cited for services in inspecting and testing the miners' oil kept by appellant for sale in said county.

The main contention of the defense is that, before the services sued for were rendered, the local act mentioned was repealed by a general act of later date that was approved on April 21, 1911, and which is entitled an act "To regulate the inspection and use of illuminants in mines in the state of Alabama and sales of illuminants for the use in mines" (Gen. Acts 1911, p. 568), and which, in section 8 thereof, contains the following repealing clause:

"That all laws, general, local or special in conflict with this act be and the same are hereby repealed. Pro-

vided that such repeal of any local or special act shall
not take effect or become operative until the first day
of March, 1913."

A comparison of the provisions of the two statutes,
in the light of the quoted repealing clause and of the
principles announced and applied in the following au-
thorities, will, we think, demonstrate that the latter so
revises the whole subject-matter of the first that it must
be construed as intending to set up a new system of
inspection and as being designed as a substitute for the
first.    This, it seems to us, so fully appears from a
mere reading of the provisions of each act as to obviate
the necessity for any discussion in fortification of the
position.—*Gibson v. Mabry,* 145 Ala. 112, 40 South.
297; *St. Clair Co. v. Smith,* 112 Ala. 349, 20 South. 384;
*Turnipseed v. Jones,* 101 Ala. 593, 14 South. 377; 36
Cyc. 1090, and cases cited; *Cahall v. C. M. B. Ass'n,* 61
Ala. 232; *Lemay v. Walker,* 62 Ala. 39; *Scott v. Simons,*
70 Ala. 352; Lewis' Sutherland, § 246; *Lehman v. Rob-
inson,* 59 Ala. 219.

Consequently, we hold that the last statute repealed
the first, unless the last is, as appellee insists, which
presents the serious question in the case, void, as in con-
flict with section 77 of the Constitution, which reads:

"No state office shall be continued or created for the
inspection or measuring of any merchandise, manufac-
ture or commodity, but any county or municipality may
appoint such officers when authorized by law."

The only time that this section of the Constitution
has been up for construction before either of our re-
viewing courts, so far as we know or are able to find,
was in the case of *State v. McGough,* 118 Ala. 159, 24
South. 395 (for the very able, illuminating, and inter-
esting opinion in which we are indebted to the lament-
ed Justice Haralson), in which case it was held that

the act entitled an act "To provide for the inspection and sale of illuminating oils in the state of Alabama," approved February 16, 1897 (Acts 1896-97, p. 1133), was unconstitutional and void, as being repugnant to said section of the Constitution, because it created a state office for the inspection of such oils. The act here attacked is so different in what we regard vital particulars from the one there declared void as to require, we think, a different conclusion. The act there considered created the state office of oil inspector, for the purpose of inspecting and testing such oils, which as seen, was in the very teeth of the express language of the constitutional provision quoted, declaring, as it does, that "no state office shall be continued or created for the inspection or measuring of any merchandise," etc. The act here does not create any office whatever, but merely provides, so far as its inspecting features are concerned, for the inspection of those illuminants that are to be used in mines, and entails the duty of making such inspections upon an existing state officer—the state mine inspector—as a part of his regular duties as such and without additional compensation. This office of state mine inspector was created by an act approved February 16, 1897 (Gen. Acts 1896-97, p. 1099), which was carried into the Code of 1896 as section 2899 et seq., and later embodied in the Code of 1907 as section 999 et seq., and subsequently revised and enlarged by an act approved April 18, 1911 (Gen. Acts 1911, p. 500).

Such office, therefore, was existing and had existed as undoubtedly valid and wholesome legislation continuously for a period of nearly 20 years, with unquestionably important and bona fide functions attached to it, as will appear from a mere reading of the statutes last cited, all designed to protect the health and lives of miners, when the act now in question was passed deal-

ing with the subject of mine illuminants, a matter so intimately connected with the safety of miners that, as must be admitted, it cannot be ignored in our legislation, if that protection to which they are justly entitled is to be vouch-safed by the law. The act here, through an evidently wise and commendable purpose on the part of the Legislature, who, no doubt, realized the lack of co-ordination in the several local laws on the subject and the impossibility of securing by such means any co-operation adequate to the end in view between the state mine inspector and the several county mine oil inspectors, who were created under such local acts, and who were consequently independent of him and independent of each other, and realizing, too, as the Legislature, no doubt, did, that any real and thorough inspection of a mine by the state mine inspector must involve a looking into the matter of the illuminants used therein, if he was to take every proper and necessary precaution as to the miners' safety, but that, if such right of inspection of oils were conferred on him, and left also in the several independent county mine oil inspectors, there would result either supererogation or a conflict of authority impairing the efficiency of the mine inspection law, sought to remove these conditions by repealing the local acts, and thereby to abolish the office of county mine oil inspector, and to confer by other provisions of the act the duty of inspecting and testing mine illuminants on an existing officer of more extensive authority (the state mine inspector), and which, to say the least, is, we think, logically appropriate as incidental to the other functions of that office and highly useful in meeting the real legislative aim for which such office was created and has been continued—the protection of the lives and health of miners.

The duties of the office of state mine inspector, as will appear from the statutes cited, existent, as said, at the time the act here considered was passed, may be sum marized briefly as relating, in the language of appellant's brief, "to ventilation, circulation, condition of air, drainage, and general security; standards, balances and means of adjusting scales; instruments for testing air; stretchers, blankets, bandages, props, timbers, and safety lamps; openings, doors, safety catches, brakes, and indicators; the manner in which gaseous mines should be operated, the examination of machinery and appliances therein; the precautions against dangerous accumulations of gas, explosions, and accidents, and the investigation and report of the same; the rules to be observed and the method of their enforcement; and the adjustment of controversies in certain cases." Hence the conferring upon such officer, as the act here involved did, of the duty of testing and inspecting the illuminants to be used and as used in such mines, affecting, as they do, the matter of smoke and the purity of mine air, was necessary to the completeness of a system of mine inspection and to the centering upon one person, one head, of the responsibility for any failure in its execution. It has been held by our Supreme Court— not having in mind, however, the section of the Constitution now under review—that the conferring of additional duties upon an existing officer is not the creation of an office.—*State, ex rel. Clarke v. Carter*, 174 Ala. 266, 56 South. 974; *State, ex rel. Vandiver v. Burke*, 175 Ala. 561, 57 South. 870. The integrity of this proposition cannot, we think, be successfully assailed, even when applied here. If true, then it cannot be said that the act attacked either "created" or "continued" any "state office" for the inspection or measur-

ing of merchandise; hence it does not fall within the letter of the constitutional inhibition.

Does it fall within the spirit of that inhibition? We think not. For authority as to the purpose of that inhibition, we cannot do better than quote the language of one whose life was an important part of the history of this state in the troublous times that gave birth to the provision, and, now that he has passed to his final reward, it is permissible even here to say, at least in scant eulogy of his worth and work, that he has left upon the records of this state—legislative, executive, and judicial—many splendid evidences of his magnificent ability and of his earnest devotion to public duty, both in peace and in war. We refer to Judge Thos. G. Jones, in whose able brief filed in behalf of the state in the case of *State v. McGough, supra,* speaking of the pur-  pose of the provision mentioned, the following language is used:

"The design was to put an end to the wholesale system of inspection when state offices were created to make them; because such inspection, sooner or later, causes solicitation of legislative power to create state offices and hatches out swarms of officers to vex the people and devour their substance."

Without such inhibition the capacity of the Legislature to multiply state offices for such inspection purposes was limited only by what happened to be its disposition and by the number of separate commodities of consumption that might be found in the commerce of the state susceptible of inspection—a power which, before the inhibition, had been so abused by what has been termed, in the political parlance of the state, "an alien Legislature" which sat during the "times of reconstruction," as to have led to the mentioned provision, first found in the Constitution of 1875, and designed to ren-

der impossible a recurrence of the evil. But for the provision, it would be possible to have, if the Legislature were so disposed, a state meat inspector, a state milk inspector, a state meal inspector, in fine, a separate state inspector for every one of the innumerable articles in daily use and that affect the health and lives of the people, the only function of whose office would be to inspect the particular article named in the act creating the particular office, and with a horde of deputies for each of such officers, one perhaps in each county, municipality, or precinct, entailing inconvenience and hardships upon the people in the enforcement of the law, to say nothing of the burdensome taxation that must result from maintaining a system that perhaps had no other real excuse for its being than originated in a desire to create or continue an office for the benefit of some legislative or executive favorite. Hence the Constitution makers of 1875, fresh from a long-suffering people lately restored to power, set themselves to the task of righting legislative wrongs that had in evil times been done, and in this instance did so by saying, in effect, in the provision of the Constitution we have quoted that no such state offices should be "continued"; and fearing lest such times, or similar unfortunate conditions of political power, might, in the cycle of unfathomed future years, return, they sought to forestall a recurrence of any evil of this character by also declaring in said provision that no such state offices should thereafter be "created," thereby removing this prolific source of legislative temptation and abuse, and rendering it thereafter impossible to create or continue a state office for the purpose of inspecting merchandise, whether the aim behind the act grew out of a bona fide intention and was an honest effort to pro-

tect and promote the public health or grew out of only a concealed desire to make a place for a favorite.

The Constitution makers realized, however, the usefulness of and the necessity to the public interest for inspection laws. Inspection itself they were not condemning, but merely the system of creating state offices for that purpose, which, if permitted, was open to such wide abuse, and that could not be definitely remedied so long as the Legislature was allowed to create offices for that purpose, since there was no way of telling whether the public necessity declared in the act as the excuse for the creation of the office was real or only feigned to hide the actual motive behind such creation, which, as said, might often be only a desire to make a berth for a favorite who had come knocking at their doors demanding recognition and reward for political services performed in aiding to bring about the elevation to office of either themselves or their Governor.

Honest purposes, however, on the part of every official are always presumed, and courts could not, in passing upon the validity of such a law, look behind the face of the act, and even in doing that we are loath to disturb any exercise by the Legislature of the police power of the state, which is very broad and far-reaching; and they would not and will not do so, if constitutional, unless such exercise was or is so unreasonable as to be void.—22 Am. & Eng. Ency. Law, 936, and cases cited. Hence no remedy for the mentioned evil rested with the courts, and the Constitution provided one in the section quoted as one of the many admirable "checks and balances" on official power with which that instrument is so wisely replete—not aimed as a reflection upon the honest, but as a safeguard against the wicked.

Such provision, however, expressly recognizes the usefulness of inspection laws by an exception contained therein, in which it permits the creation of offices even solely for inspection purposes, provided the office is not a state office and the appointment of the official is left by the act of creation to county or municipal authorities; and we do not interpret the provision as prohibiting the exercise by appropriate state officers of inspecting powers, unless the office was "created or continued" for that purpose—inspection—which was the case in the act condemned in *State v. McGough, supra,* but which is not the case in the act here involved. In our opinion, if a state office exists or is created for other necessary and important purposes of government as its chief aim, then the Constitution does not inhibit the conferring upon the holder of such office of powers of inspection of a character appropriate and incidental to the discharge of the main functions of the office, which is the case here. "No state office shall be created or continued," says the section, "for the inspection or measuring of any merchandise," etc. But it does not say that when a state office is or has been created or continued, for other legitimate governmental purposes, such inspection or measuring powers shall not be conferred upon it.

We are aware that there are expressions in the *McGough Case, supra,* indicating possibly a contrary view; but such expressions were not necessary to the conclusion there reached as to the invalidity of the act there under review, and are consequently dicta, thereby leaving us in a position where we cannot escape the responsibility of meeting squarely the issue here presented. The decisions, and not the dicta, of our Supreme Court are binding on us; and when our own judgment is at variance with those dicta, we have no right to

shift the responsibility by following the dicta, for if we did it might do our highest court an injustice, and would certainly fail to meet our own sense and conception as to our duty in the premises. Their view as to the correctness vel non of the dicta may be ascertained by certiorari. . We are required to certify questions for their determination only in cases of disagreement between the judges of this court or when we are of the opinion that an act in question is unconstitutional, and not in cases where, as here, we are of opinion that it is constitutional.

The interpretation we here give to the constitutional provision offends neither its letter nor its spirit, and at the same time prevents the evils intended, in that it affords no room for evasion by the Legislature; since any act passed conferring such inspection powers upon existing or presently created or continued state officers must run the gauntlet of the courts and contain, satisfactory to them, as the excuse for its being and as the chief aim and object thereof, some substantial governmental end other than the mere creation or the continuance of the office for inspection purposes. There are some limits to these ends, and the courts are not so blind but what they could and can see them, and could and would consequently check any advance upon or evasion by the Legislature of the provision mentioned, keeping the latter within due bounds (which could not before the provision be done for reasons pointed out), and at the same time leaving, as the Constitution, we think, intended, this important arm of government free to confer the power mentioned, wherever, in its judgment and discretion, it is deemed best for the public good, so long as it neither created nor continued any state office for that purpose or as the sole, chief, or controlling aim for its existence; this limitation upon legis-

lative power, otherwise unlimited, in the Constitution, to create offices, being set solely because the field into which the Legislature were thus prohibited from entering, unlike all others, was so wide, so easy, and so tempting, and furnished such an apparently legitimate excuse for office creating—the protection of the public health.

In this connection, we quote approvingly the following from appellant's brief:

"It was apprehended that inspection laws would not become burdensome, if divorced from the attractive feature of office and office holder, for the purpose, but it can hardly be conceived that the Legislature has been deprived of the right to vest in a state officer additional powers whenever necessary to the efficient performance of his already existing duties, particularly when that officer with state-wide responsibilities is, in the nature of things, the logical person to perform them. * * * We admit that the Legislature could not evade the Constitutional provision by conferring in bad faith the power mentioned upon some existing state officer, * * *. or by creating an office nominally for a different purpose and adding to its powers the right of inspection. This would be a palpable evasion of the Constitution and could easily be disposed of. But the office of state mine inspector does not have to apologize for its creation, nor justify its existence upon the duty of inspecting oil. It has long existed for a greater purpose, and all of its duties are the natural parts of a comprehensive whole."

We have in our statutes a law of long standing, the validity of which, so far as we know, has never been brought into question, conferring upon the state commissioner of agriculture and industries the power and duty of inspecting commercial fertilizers (Code, § 22,

subds. 17, 20, and section 46), and, by a recent enactment, the duty of making the inspections required under the "Pure Food and Drugs Act" (Gen. and Loc. Acts Sp. Sess. 1909, p. 237). Without considering or committing ourselves to the validity of either of these statutes as to features not here under consideration, we may say that, if the act now under review is to fall because it confers on a state officer, existing for other lawful and proper purposes, the power of inspecting certain articles, it would seem that a like result must follow as to the mentioned statutes conferring inspecting powers on the said commissioner of agriculture and industries, if brought into question. His officce, it is true, is of constitutional creation (Const. 1901, § 112); but his duties are not therein defined. It is a state office, as much so as that of state mine inspector, and, if it is a violation of the quoted provision of the Constitution for the Legislature to confer on the state mine inspector, as incidental to his other duties, the duty of inspecting certain commodities, why would it not likewise be such a violation to confer on the commissioner of agriculture and industries inspecting powers? The truth is, we think, as we have endeavored to demonstrate, and we so hold, that the constitutional provision was not designed to prevent the conferring upon and the exercise by state officers of inspecting powers, but to prevent the Legislature from "creating or continuing" any state office for that purpose. If the office exists or is created or continued for other lawful and substantial and useful governmental ends and aims, as the real object for its creation or continuance, then such provision does not, we think, forbid the conferring upon and the exercise by such officer of such power as appropriate and incidental to the other functions of his office. Any other construction will unnecessarily hamper progress

and development in useful, if not to say necessary, fields of legislation.

The conclusion reached, that the act here is constitutional, obviates the occasion for any consideration of the other questions raised by the record, and necessitates a reversal of the judgment appealed from and the rendering of one here for the appellant; since the complaint, predicated, as it is, alone upon the repealed act referred to, contains no cause of action, as pointed out in the demurrers thereto, which should have been sustained, and which complaint cannot be amended, for reasons shown, so as to state a cause of action; the services for which it seeks recovery having been performed under the act shown to have been repealed before the services were performed.

Reversed and rendered.

